# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

PAMELA JORDAN,     *
          *
   Plaintiff,    *
          *
 v.          *     CV 110-037
          *
          *
COLUMBIA COUNTY BOARD OF *
EDUCATION; COLUMBIA COUNTY *
SCHOOL SYSTEM; DEPARTMENT *
OF TRANSPORTATION;   *
Superintendent of Schools *
CHARLES R. NAGLE; DEWAYNE *
PORTER, Director of   *
Transportation; Assistant *
Superintendent ROBERT  *
JARRELL, and CCBOE   *
Chairman REGINA BUCCAFUSCO; *
CCBOE Vice-Chairman MIKE *
SLEEPER; CCBOE Member MILDRED *
BLACKBURN; CCBOE Member WAYNE *
BRIDGES; CCBOE Member ROXANNE *
WHITAKER,      *
          *
          *
   Defendants.   *

## O R D E R

Presently before the Court is Defendants' Motion for Summary Judgment. (Doc. No. 32.) For the reasons set forth below, Defendants' motion is **GRANTED**.

## I. BACKGROUND

On a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party,

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." *United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). In the present case, however, most of the operative facts are not in dispute. In fact, while Plaintiff "disputes" many of the facts set forth in Defendants' Statement of Undisputed Material Facts and Conclusions of Law, it appears that Plaintiff is not denying the actual facts but rather the implication of those facts. In other words, Plaintiff "disputes" the legal conclusions to be drawn from those facts as opposed to the accuracy of the facts as stated. Nevertheless, to the extent that there is a genuine issue of *disputed fact*, the Court has construed the facts in Plaintiff's favor.

### A. Factual Background

This case arises from Plaintiff's September 29, 2009 termination from her position as a bus driver for the Columbia County School District ("School District"). Plaintiff was hired by the School District in August of 2005 for an indefinite period of time. (Jordan Dep. at 19, 43.) During her time as a driver, Plaintiff worked without an employment contract. (Id. at 43.) She joined the Transport Workers Union Local No. 279 shortly after being hired by the School District and attended

2

union meetings and other various union functions over the course of her employment. (Id. at 40-42.)

As a bus driver, Plaintiff was the subject of numerous complaints by both parents and students and faced disciplinary action as a result. In 2006, Plaintiff was disciplined for transporting an unauthorized student on her bus. (Porter Dep. at 173-176.) It was later discovered that the unauthorized student brandished a knife while on board. (Id.) Plaintiff asserts she was unaware that the student, who had previously been a student on her route, had dropped out of school, and therefore claims she had no reason to suspect that transporting the student violated School District policy. (Jordan Dep. at 59.) Plaintiff received a three day suspension as a result of the violation. (Porter Dep. at 175.)

Between 2006 and 2008, Plaintiff worked as a bus driver without incident. However, in November of 2008, a concerned citizen reported observing Plaintiff's bus speeding on Mullikin Road on three separate occasions. (Id. at 448.) Global Positioning Station (GPS) data confirmed that Plaintiff traveled as fast as fifty-four miles per hour in a thirty-five mile per hour zone. (Pl.'s Ex. 24.) Plaintiff, however, denies speeding. (Jordan Dep. at 58.) A letter of advisement and caution was issued to Plaintiff as a result of the speeding allegations. (Porter Dep. at 448.)

3

In December of 2008, Dewayne Porter, Director of the Columbia County Transportation Department, received numerous complaints regarding Plaintiff's unprofessional behavior. (Id. at 176.) Revelle Cox, the Principal at River Ridge Elementary School ("River Ridge"), wrote Porter explaining that Plaintiff was regularly late arriving to the school. (Pl.'s Ex. 19.) Cox stated that Plaintiff's lack of punctuality was an ongoing problem and that numerous teachers complained that students were routinely late for class by at least fifteen (15) minutes. (Id.) Plaintiff was also observed sitting along the side of the roadway smoking and talking on her cell phone during the time that she should have been at the school picking up students. (Id.) Plaintiff disputes these allegations and claims that her tardiness was due to the addition of new students to her route. (Jordan Dep. at 39-40.)

Because of these problems regarding Plaintiff's failure to adhere to her bus schedule, a School District employee, Mr. Dudley, was assigned to ride with her and provide assistance. (Porter Dep. at 195.) Only a week into this arrangement, Mr. Dudley informed Shirley Doolittle, Assistant Director of the Transportation Department, that he could no longer work with Plaintiff because she was extremely argumentative. (Jarrell Dep. at 44.)

In March of 2009, Plaintiff was involved in a bus accident. (Porter Dep. at 202.) She struck a car parked along the side of

4

the roadway. (Id.) At the time of the accident, no students were on board. (Id.) According to Porter, Plaintiff was directed to immediately report to Evans Urgent Care for a drug/alcohol screening, but she failed to report in a timely manner. (Id.) It is School District policy to require drivers to undergo a drug/alcohol screen following an accident, regardless of whether the driver was at fault. (Id. at 206.) Plaintiff, however, claims she was not told to report immediately. (Jordan Dep. at 34.) Instead, she states that Ms. Doolittle told her to go as soon as possible after she dropped off the students on her high school route. (Id.) Plaintiff asserts that she dropped the students off a little before 9:00 a.m. and went home. (Id.) She then left her house at 12:30 p.m. and proceeded to Evans Urgent Care. (Id.)

When Plaintiff finally arrived for her drug/alcohol screening, she was required to wait fifteen minutes before submitting a urine sample, which, according to Plaintiff, amounted to "cruel and unfair treatment." (Id. at 34-35.) Plaintiff's first sample was rejected because it was determined to be of "non-human" origin. (Porter Dep. at 209-10.) Therefore it was necessary for Plaintiff to present a second sample, which was also rejected because it was diluted. (Id. at 211.) Based upon her failure to submit to the drug/alcohol screening in a timely manner, Plaintiff was suspended by Charles Nagle, Superintendent of the Columbia County School District,

5

for eight days. (Pl.'s Ex. 24.) Plaintiff feels that this suspension was meant to humiliate and harass her to the point of forcing her resignation. (Jordan Dep. at 37.)

The incident that ultimately led to Plaintiff's termination occurred on September 22, 2009. Porter received an e-mail from a parent claiming that Plaintiff was driving erratically while using a cell phone. (Pl.'s Ex. 24.) Porter investigated the complaint by interviewing five students who confirmed that Plaintiff used her cell phone and photographed students on her bus. (Id.) Porter subsequently received a videotape taken by a student on Plaintiff's bus. (Porter Dep. at 251.) The videotape showed Plaintiff holding a cell phone in her left hand over her head while her right hand remained on the steering wheel. (Id. at 235.)

Plaintiff admits using her phone in the manner depicted on the videotape. (Jordan Dep. at 53.) She claims that she held up her phone in order to leave the students with the impression that she would take photographs of them misbehaving and turn them over to the school administration. (Id. at 48.) Plaintiff further admits that the School District had a policy prohibiting the use of cell phones while driving, but she believes she did not violate the policy because she never turned her phone on. (Id. at 55.) Plaintiff also denies ever taking her eyes off the road during the incident. (Id. at 53.) The audio portion of the videotape demonstrates that while Plaintiff is holding the

6

phone over her head, at least one student screams obscenities at her. (Porter Dep. at 251.)

Porter met with Plaintiff on three occasions to discuss the cell phone incident. (Id. at 439.) According to Porter, Plaintiff was combative during the meetings, with one ending abruptly after Plaintiff threatened legal action. (Id.) During his final meeting with Plaintiff, Porter informed her of his decision to recommend termination. (Id. at 234.) He also advised her of her right to appeal to Robert Jarrell, Assistant Superintendent of the Columbia County School District. Plaintiff subsequently met with Jarrell to discuss the termination recommendation. (Jordan Dep. at 73-76.) Jarrell reviewed Plaintiff's written statement and the documents compiled by Porter during the course of his investigation. (Jarrell Dep. at 31.) Jarrell decided, after considering Plaintiff's history of disciplinary violations, to uphold Porter's recommendation of termination. (Id. at 56.)

Superintendent Nagle reviewed the termination recommendations of both Porter and Jarrell. He upheld the termination recommendations because Plaintiff had a lengthy history of misconduct, insubordination and policy violations. (First Aff. of Nagle ¶ 5.) Moreover, he determined that Plaintiff's use of her cell phone violated both School District policy and Georgia law. (Id.) He informed the Columbia County School Board (the "Board") of his termination recommendation,

7

and advised Plaintiff of her right to have her termination reviewed by the Board. (Nagle Dep. at 41-42.)

Plaintiff requested that the Board review Superintendent Nagle's recommendation. (Jordan Dep. at 80.) Plaintiff also requested that the Board conduct a hearing on her appeal. (Id. at 81.) She believed that a hearing would resolve any issues and ensure that she remained employed as a bus driver. (Id.) Superintendent Nagle presented the Board members with a compilation of documents relating to Plaintiff's case including Plaintiff's statement regarding the event and the recommendations of Porter and Jarrell. (First Aff. of Nagle ¶ 9; Jordan Dep. at 83.) The Board members reviewed these materials and voted to approve the termination recommendation. (Whitaker Aff. ¶¶ 7, 10; Bridges Aff. ¶¶ 7, 10; Blackburn Aff. ¶¶ 7, 10; Sleeper Aff. ¶¶ 7, 10; Buccafusco Aff. ¶¶ 7, 10.) They also voted to consider Plaintiff's appeal without granting her request for a hearing on the matter. (Id. ¶ 8.) They felt that a hearing was unnecessary because the information they received was sufficient to allow them to make a decision without holding a hearing. (Id.) The Board members terminated Plaintiff's employment because they determined that Plaintiff's extensive history of employee misconduct, violations of School District policies, and insubordination, culminating in her violation of both Georgia law and School District policy constituted appropriate grounds for termination. (Id. ¶ 10.)

## B. **Procedural History**

On January 15, 2010, Plaintiff filed a complaint in the Superior Court of Columbia County alleging that Defendants violated her procedural and substantive due process rights by terminating her employment as a bus driver. (Doc. no. 1, Ex. A.) Plaintiff sought a writ of mandamus to remedy the alleged illegal conduct of Defendants. Defendants subsequently removed this action to federal court on the basis of federal question jurisdiction. (Doc. no. 1.)

After the case was removed to federal court, Plaintiff amended her complaint to add two additional claims. (Doc. no. 13.) First, she alleged that the Board breached a 2007 Settlement Agreement by failing to provide her with an appeal hearing prior to her termination.[1] Second, Plaintiff alleged that Defendants retaliated against union employees in violation of the First and Fourteenth Amendments.

## II. **SUMMARY JUDGMENT STANDARD**

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must

---

[1] See infra footnote 10.

view the facts in the light most favorable to the non-moving party, Matsushita, 475 U.S. at 587, and must draw "all justifiable inferences in [its] favor." Four Parcels, 941 F.2d at 1437 (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrate[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave Plaintiff appropriate notice of the motion for summary judgment and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default.

(Doc. no. 53.)   Therefore, the notice requirements of <u>Griffith</u> <u>v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.   The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

## III. <u>DISCUSSION</u>

### A.   **Qualified Immunity**

The individual Defendants claim that they are entitled to qualified immunity on Plaintiff's freedom of association, equal protection, and due process claims brought pursuant to 42 U.S.C. § 1983.   A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity.   <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1263 (11th Cir. 2004).   It is well established that "[q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).

To be eligible for qualified immunity, the official must first establish that he was performing a "discretionary function" at the time the alleged violation of federal law occurred.   <u>Crosby v. Monroe Cnty.</u>, 394 F.3d 1328, 1331 (11th Cir. 2004).   Once the official has established that he was

12

engaged in a discretionary function, the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity. Holloman, 370 F.3d at 1264. The Supreme Court has set forth a two part test for the qualified immunity analysis. "The threshold inquiry a court must undertake . . . is whether [the] plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). If no constitutional right would have been violated, it is unnecessary to continue the qualified immunity inquiry. Saucier, 533 U.S. at 201. However, if a constitutional right would have been violated under the plaintiff's version of the facts, the next, sequential step is to ask whether the right was clearly established. Vinyard, 311 F.3d at 1346 (internal citations and quotations omitted).

In this case, Defendants were performing a "discretionary function" of their positions when they allegedly violated Plaintiff's constitutional rights, a fact that is not disputed by either party. The burden therefore shifts to Plaintiff to show a violation of her constitutional rights. See Hope, 536 U.S. at 736. As discussed below, Plaintiff cannot establish a constitutional violation, and therefore, the individual Defendants are entitled to qualified immunity.[2]

---

[2] The Court recognizes that it is no longer bound to follow the two-step Saucier analysis for qualified immunity, but instead has flexibility to decide which of the two prongs should be addressed first in light of the

## B. Claims Relating to Termination[3]

### 1. Violation of the Right to Free Association

Plaintiff, by way of 42 U.S.C. § 1983, alleges that Defendants violated her First Amendment right of freedom of association.[4] The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the Government for a redress of grievances." U.S. Const. amend. I. Implicit in the right to engage in these First Amendment activities is a "corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Roberts v. United States Jaycees, 486 U.S. 609, 622 (1984). To establish a claim under § 1983 for violating First Amendment rights, a plaintiff must show (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of state law. Holmes

---

circumstances in the particular case at hand. See Pearson v. Callahan, 555 U.S. 223, 224-25 (2009). Under the facts of this case, it was more appropriate to first address the existence of a constitutional violation.

[3] Defendants dedicated a significant portion of their brief to the argument that the lack of a discriminatory animus on behalf of a "final policymaker" or "final decision maker" precludes recovery against any Defendant under § 1983. However, because Plaintiff could not establish any claim under § 1983, the Court did not consider the policymaker analysis.

[4] Although Plaintiff's Complaint alleges a First Amendment violation generally, it does not appear that she is advancing a freedom of speech claim. Plaintiff asserts that she was terminated because of her participation in the union, not because of any particular speech associated with her union affiliation. Thus, her claim arises from an alleged violation of her freedom of association rights, not her free speech rights.

14

v. Crosby, 418 F.3d 1256, 1258 (11th Cir. 2005); Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001).

Public employees, including Plaintiff, are protected by the right to free association, and the First Amendment prohibits retaliation based on the expression of that right. Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) ("The Court has made clear that public employees do not surrender all of their First Amendment rights by reason of their employment."); Smith v. Arkansas State Highway Emps., Local 1315, 441 U.S. 463, 465 (1979) ("The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so." (citing Pickering v. Bd. of Educ., 391 U.S. 563, 574-75 (1968))). The right to freely associate, however, is not unqualified. See Garcetti, 547 U.S. at 418 ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom.").

The framework for striking the appropriate balance between a public employee's First Amendment rights and the government's interest in efficiency was established in Pickering v. Board of Education, 391 U.S. 563 (1968). First, a plaintiff must prove that she was engaging in associative activity not in the course of her employment, but rather as a "citizen." D'Angelo v. Sch. Bd. of Polk Cnty., 497 F.3d 1203, 1212 (11th Cir. 2007). Here, Plaintiff's union membership amounts to associative activity as

a citizen. See Douglas v. Dekalb Cnty., No. 1:06-cv-484, 2007 WL 4373970, at *3 (citing Fuerst v. Clarke, 454 F.3d 770, 774 (7th Cir. 2006)). Once a plaintiff has met her burden on this threshold legal issue, a court must determine (1) whether an adverse action occurred, and (2) whether the constitutionally protected association was a substantial or motivating factor in the employment decision. Starling v. Bd. of Cnty. Comm'rs, 602 F.3d 1257, 1261 n. 1 (11th Cir. 2010); Hatcher v. Bd. of Pub. Educ., 809 F.2d 1546, 1558 (11th Cir. 1987). If the employee can meet this burden, the burden shifts to the employer to show that it would have made the same decision, even in the absence of the protected conduct. Douglas, 2007 WL 4373970, at *3.

Based on the evidence presented, there is no need to balance the Pickering factors because Plaintiff's union activity did not form the basis of the termination decision. See Douglas v. Dekalb Cnty., 308 Fed. Appx. 396, 399 n. 1 (11th Cir. 2009) ("Since we are persuaded the adverse employment actions were not motivated by protected union activity, we need not perform a Pickering balancing."); Shahar v. Bowers, 114 F.3d 1097, 1113 (11th Cir. 1997) ("Pickering balancing does not apply where the employee's constitutionally protected conduct did not motivate the employer's decision. In such a case, balancing is not necessary; the employer prevails because the employee has not established the element of causation.") (Tjoflat, J. specially concurring). Although Plaintiff was a union member, the record

16

contains an overwhelming amount of evidence that Plaintiff violated Board policies and would have been terminated even in the absence of protected union activity.

Porter explained that he based his recommendation on Plaintiff's continued failure to follow department policies concerning student discipline, safe operating procedures, and cell phone usage. (Porter Dep. at 447.) He not only considered the most recent report that Plaintiff improperly used her cell phone while driving, but he also considered her past disciplinary history and combative nature when deciding to recommend termination. (Id.) Moreover, Jarrell stated that Plaintiff was terminated based on violations of Board policy and her history of misconduct. (Jarrell Dep. at 53, 63.) Superintendent Nagle upheld the termination recommendations for similar reasons and stated that Plaintiff's cell phone usage was especially problematic given recent deaths resulting from texting while driving. (Nagle Dep. at 48.) Thus, Plaintiff's pattern of misconduct justified her termination.

Even if this Court were to balance the Pickering factors, Plaintiff is unable to demonstrate that her union affiliation played a substantial part in the termination decision. In order for Plaintiff to carry her burden on this issue, she must produce "more than a mere scintilla of evidence that [her union affiliation] played a substantial part in the decision not to keep her on as an [employee]." Bartes v. School Bd. of Alachua

Cnty., No. 04-15459, 2005 WL 2764744, at *4 (11th Cir. 2005).
Plaintiff has not met her burden. Although Plaintiff presented
evidence that Porter was aware of her union membership, there is
no evidence that it played a role in his recommendation. When
asked if he considered her union membership in making his
recommendation, Porter stated that he did not. (Porter Dep. at
442.) Moreover, he explained that he would have made the same
decision regardless of whether Plaintiff was a union member.
(Id.)

Furthermore, four of the five Board members stated that
they were unaware of Plaintiff's union affiliation and that they
based their termination decisions on the compilation of
materials presented to them. (Whitaker Aff. ¶¶ 7, 9; Bridges
Aff. ¶¶ 7, 9; Blackburn Aff. ¶¶ 7, 9; Buccafusco Aff. ¶¶ 7, 9.)
They voted in favor of terminating Plaintiff's employment after
determining that she had an extensive history of employee
misconduct, violations of School District policies,
insubordination, and threats of litigation against the School
District. (Id. ¶ 10.) Additionally, the Board members stated
that Plaintiff's history of misconduct culminated in her
violation of both Georgia law and School District policy when
she held a cell phone over her head and pretended to take
photographs of students while driving. (Id.) This conduct,
according to the Board members, endangered the safety of both
Plaintiff and the children on her bus. (Id.) Although the

final Board member, Mr. Sleeper, was aware of Plaintiff's union affiliation, he stated that he did not consider union affiliation when voting to terminate her employment and confirmed that he would have made the same decision regardless of her union affiliation. (Sleeper Aff. ¶¶ 10-11.) Plaintiff has offered no evidence, other than conjecture, to rebut this testimony.

Based upon the foregoing, the evidence establishes that Plaintiff was terminated for her repeated violations of School District policy. Although Plaintiff claims that her pattern of discipline was a direct result of her union participation, the evidence establishes as a matter of law that Plaintiff was not terminated for union activity. Thus, Defendants' motion for summary judgment on Plaintiff's freedom of association claim is **GRANTED**.[5]

---

[5] Plaintiff also argues that a "cat's paw theory" of liability should apply because the School Board approved Porter's termination recommendation without conducting an independent investigation. The cat's paw theory allows a plaintiff to establish causation by showing that the decision maker followed a biased recommendation without independently investigating the complaint against the employee. Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999). In such a case, the recommender is using the decision maker as a mere conduit, or "cat's paw," to give effect to the recommender's discriminatory animus. Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998).

Assuming that Porter did make his recommendation based on Plaintiff's union affiliation, there is no evidence that Jarrell, Superintendent Nagle, and the Board members acted as "mere conduits" for Porter's discriminatory animus. Although these individuals considered Porter's recommendation, they made their employment decisions based on the totality of the circumstances, including an independent review of the record. (Whitaker Aff. ¶ 7; Bridges Aff. ¶7; Blackburn Aff. ¶ 7; Sleeper Aff. ¶ 7; Buccafusco Aff. ¶ 7.) Without evidence that the Board members effectuated Porter's recommendation without conducting an independent review, Plaintiff cannot use the cat's paw theory to establish liability.

2.   Violation of Equal Protection Rights[6]

Plaintiff also asserts that her termination amounted to a violation of her equal protection rights. Specifically, Plaintiff claims that the Board upheld the termination recommendation because of her classification as a union member. The Equal Protection Clause prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XVI, § 1. The Clause embodies the principle that all similarly situated people should be treated alike. City of Cleburn v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). To establish her claim, Plaintiff must show that (1) she was treated differently from others who were similarly situated on the basis of her union activities, and (2) Defendants had no rational basis for the alleged dissimilar treatment. Smith v. Atlanta Indep. Sch. Dist., 633 F. Supp. 2d

---

[6] Plaintiff did not specifically plead an Equal Protection violation in her amended complaint. Instead, the amended complaint raises a breach of contract claim, a due process claim, and a First Amendment claim. Under established Eleventh Circuit precedent, the non-moving party may not assert new claims at the summary judgment stage. Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314 (11th Cir. 2004). "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." Id. at 1315.

The Court, however, addresses the Equal Protection claim because of its close connection with Plaintiff's Freedom of Association claim. In her amended complaint, Plaintiff alleges that Defendants took "retaliatory actions against" members of the union. (Doc. no. 13 at ¶ 9.) As evidence of retaliation, Plaintiff alleges that union employees were subject to "selective enforcement of work rules, selective implementation of disciplinary actions, undue scrutiny . . ., and selective granting of employment benefits." (Id. at ¶ 10.) These allegations suggest the basis of Plaintiff's retaliation claim may be the differential treatment of union members as compared to non-union members. Thus, the Court considered both an Equal Protection claim and a First Amendment claim.

1364, 1381 (N.D. Ga. 2009) (citing Cleburn, 473 U.S. at 439-42).

"Different treatment of dissimilarly situated persons does not violate the equal protection clause," and courts are obligated to apply the similarly situated requirements with rigor. Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1207 (11th Cir. 2007) (citing E&T Realty v. Strickland, 830 F.2d 1107, 1009 (11th Cir. 1987) (internal quotations omitted)).

The Eleventh Circuit has held that when an employee alleges discriminatory discipline, to determine whether employees are similarly situated, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (internal citations omitted).[7] "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." Id. The quantity and quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions. Id.

Plaintiff identifies several non-union employees who she believes engaged in conduct that was similar to hers, but who

_____

[7] The Court is cognizant of the fact that the plaintiff in Maniccia claimed that her termination violated Title VII and that she did not assert an Equal Protection claim pursuant to § 1983. Despite the difference in the claim asserted, the similarly situated standard of Maniccia is applicable in the Equal Protection context. Other courts have applied a similar analysis when determining whether employees were similarly situated for Equal Protection purposes. See Catlett v. Peters, No. 98-CV-3273, 1999 WL 1269196, at *7-8 (N.D. Ill. Dec. 23, 1999); Grady v. City of Orlando, No. 96-CV-1295, 1998 WL 657663, at *3-4 (M.D. Fla. June 25, 1998).

received less severe punishments. She points to three specific individuals: Billy Wilkes, Cathy Lee Caywood, and Jack Roy. Mr. Wilkes was a non-union driver accused of using a cell phone while speeding. (Porter Dep. at 238.) It was reported that Mr. Wilkes was travelling at a rate of seventy miles per hour on the interstate. (Jarrell Dep. at 50.) Porter confirmed that Mr. Wilkes was speeding by examining the GPS reports from Mr. Wilkes' bus. (Porter Dep. at 238.) Porter admits that he never compared Mr. Wilkes' cell phone records with the GPS times so he could not verify whether Plaintiff was in fact on his cell phone at the time he was seen speeding. (Id. at 242.) As a consequence of the incident, Mr. Wilkes was removed from the interstate portion of his route, which resulted in a reduction in pay. (Jarrell Dep. at 52.)

Ms. Caywood was a non-union driver accused of using her cell phone while driving. (Porter Dep. at 240.) Upon meeting with Porter, Ms. Caywood explained that, during her route, she pulled her bus over to the shoulder in order to make phone calls. (Id. at 240.) Porter advised her not to make calls unless there was an emergency that needed reporting. (Id.) Porter did not subject Ms. Caywood to disciplinary action because he determined that despite making a phone call, Ms. Caywood followed proper protocol which required a driver to pull a bus over before operating a cell phone. (Id.)

Mr. Roy was a non-union driver involved in a series of preventable accidents. (Porter Dep. at 487.) While operating his bus, he hit a parked car and ran over the bumper of another car. After these accidents, he was sent for drug testing. (Id.) Porter, concerned about Mr. Roy's troubling driving record, sent him for retraining. Mr. Roy was subsequently involved in another accident causing him to resign from his position as a bus driver. (Id.)

Despite identifying three non-union employees, Plaintiff has not presented a valid comparator as a matter of law. Although the comparators identified by Plaintiff arguably engaged in misconduct similar to hers, these cases are distinguishable based on quantity. Plaintiff was not disciplined for a series of car accidents or an isolated incident involving her cell phone. Moreover, she was not terminated based upon the accusation that she was seen speeding down Mullikin Road. Instead, Plaintiff had a significant history of misconduct during her time as a bus driver in Columbia County. She was accused of violating various school policies including transporting an unauthorized student, failing to timely report for a drug test, and insubordination. These policy violations culminated in Plaintiff's unlawful use of her cell phone while driving. Plaintiff failed to present a non-union employee with a similar disciplinary record who was not terminated. Accordingly, as Plaintiff has failed to present

23

proper comparators, she cannot establish that her equal protection rights were violated, and Defendants' motion for summary judgment on the equal protection claim is **GRANTED**. See Harlen Assocs. v. Inc. Vill. Of Mineola, 273 F.3d 494, 499 n. 2 (2d Cir. 2001) ("[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.").[8]

---

[8]    Plaintiff also identifies Pat Merritt as a similarly situated non-union employee who received more favorable treatment than Plaintiff. Porter received several complaints regarding Ms. Merritt from both students and parents. (Porter Dep. at 484.) To resolve the problems, Porter placed a full time bus monitor on her route. (Id.) Additionally, a camera was installed on her bus to monitor both her behavior as well as the students' behavior. (Id.)

Plaintiff points to the treatment of Ms. Merritt as evidence that Plaintiff was subject to more severe discipline by Porter. She claims that when dealing with Ms. Merritt, Porter considered the possibility that Ms. Merritt's problems may have stemmed from an unusual combination of children and parents. (Doc. no. 66 at 7.) According to Plaintiff, not only did Porter fail to consider that the students on her route may have been especially unruly, but he was also unwilling to provide Plaintiff with a camera to monitor the students' behavior. Had he done so, according to Plaintiff, the problems could have been remedied in a manner that did not result in Plaintiff's termination.

Despite the fact that both drivers faced complaints from parents and students, the cases of Plaintiff and Ms. Merritt are distinguishable. As a result, Ms. Merritt is not a similarly situated individual. Porter testified that he could not corroborate the statements made about Ms. Merritt. (Porter Dep. at 485.) He also believed that some parents had threatened Ms. Merritt. (Id. at 531.) Therefore, he felt that a camera on the bus would be beneficial to all parties involved. (Id.) Porter stated that unlike Ms. Merritt, Plaintiff did not document the threats made against her. (Id. at 532.) Although he considered Plaintiff's accusations that the students threatened her, he could not find any evidence to substantiate the threats and therefore did not feel that a camera on her route was necessary. (Id.) Moreover, while Porter placed a full time monitor on Ms. Merritt's route, Plaintiff also received several monitors to assist with the students on her route.

## C.   Claims Relating to Termination Procedures

### 1. Violation of Settlement Agreement[9]

Plaintiff asserts that the Board's failure to grant her request for an appeal hearing amounted to a violation of the 2007 Settlement Agreement ("Settlement Agreement").   The Settlement Agreement at issue was the result of a prior lawsuit between members of Plaintiff's union and the School District.[10] Plaintiff's claim that the Board violated the Settlement Agreement appears to be twofold.   First, the Settlement Agreement stated that School Board counsel would provide an "expanded grievance policy."   Plaintiff, however, argues that the Board restricted the grievance procedures instead of expanding them.   Second, Plaintiff contends that the Board's failure to provide her a direct appeal and a hearing amounted to a violation of the Settlement Agreement.

In order to understand Plaintiff's contentions, it is necessary to distinguish between the two types of School District employees: certified personnel and classified at-will

---

[9]   Plaintiff's breach of contract claim is pursued only against the Board, and not against any individual Defendant. (Joint Stipulations ¶ 7.)

[10] In the prior suit, members of the Transport Workers Union of America, AFL-CIO, and Transport Workers Union Local Union No. 279 filed suit against the Columbia County School District and the members of the Columbia County Board of Education in the United States District Court for the Southern District of Georgia, Augusta Division.   The plaintiffs alleged that they were denied the opportunity to speak about certain matters and that they were discriminated against based on their union affiliation.   In an effort to mutually resolve the issues without a Court proceeding, the parties agreed to the terms of the Settlement Agreement.

personnel. (Nagle Dep. at 28-29.) Certified employees include teachers, administrators, and certified educators. (Id. at 28.) They hold advanced degrees in education or possess other state certifications. (Id.) Classified at-will employees are non-certified staff including custodians, bus drivers, secretaries, paraprofessionals, and nutrition employees. (Id.) Pursuant to O.C.G.A. § 20-2-211, all certified professional personnel must be issued an annual contract. Classified at-will employees, on the other hand, are not entitled to a contract of employment and are at-will employees. Plaintiff was a classified at-will employee as evidenced by the fact that she was hired for an indefinite period of time and worked without a contract of employment. (Jordan Dep. at 43.)

The School District maintains separate and distinct policies and procedures for certified and classified at-will employees. The policy and procedures applicable to Complaints and Grievances of *certified employees* are coded "GAE." The policy and procedures applicable to the suspension and termination of *classified at-will personnel* are coded "GCK." For ease of reference, the Court will refer to the two categories of employees henceforth as either certified or classified at-will employees, Plaintiff falling into the latter category.

## a.    **Policy GAE Does not Apply to Plaintiff**

Under the terms of the Settlement Agreement, the Board stated that it would expand the grievance procedures for classified at-will employees.   The pertinent provision of the Settlement Agreement is as follows:

> In the best interest of all parties and all employees, School Board Counsel will draft an expanded grievance policy (GAE-1)[11] for all classified employees, including employees of the Transportation Department. Pursuant to this expanded policy, classified employees with at least 24 months of continuous service with the Board of Education can appeal to the Board of Education or its Personnel Committee any recommendation to terminate such employee(s) before final action to terminate is taken by the Board.   The Administration will continue implementing procedures on due process.   The Administration will prepare procedures to define process.

(Doc. no. 39 at 9.)

Prior to the Settlement Agreement, Policy GAE (applicable to certified employees) provided that "when hearing an appeal from a prior level, the local Board of Education shall hear and decide all appeals de novo."   (Hobbs Aff., Ex. A.)   In promising to expand the grievance policy for classified at-will employees, the Board revised Policy GCK (applicable to classified at-will employees) to provide: "Upon good cause the Board may grant such employees the opportunity of an appeal hearing."   (Pl.'s Ex. 44.)   Plaintiff's first claim with respect to the Settlement Agreement is that the Board did not provide an "expanded

_____

[11] The policy that applies to classified at-will employees is actually policy "GCK."   The policy was erroneously identified as "GAE1" in the Settlement Agreement.   "GAE1" applies to certified employees, and "GCK" applies to at-will, "classified" employees.   (Nagel Aff. ¶ 14.)

27

grievance policy." Instead, Plaintiff contends that the implementation of the revised Policy GCK restricted the rights available under Policy GAE because classified at-will employees are no longer entitled to an automatic appeal hearing. Stated differently, Plaintiff contends that the revised version of Policy GCK restricts the appeal rights available under Policy GAE such that the Board failed to provide for an "expanded grievance policy" as set forth in the Settlement Agreement.

At the outset, the Court recognizes that Plaintiff's contention presupposes that she was subject to Policy GAE. She was not. In reviewing Policy GAE, the Court notes that it clearly applies only to certified personnel. Not only does Policy GAE reference "certified" employees, but the purpose of the policy is to implement the provisions of O.C.G.A. § 20-2-989.5. (Hobbs Aff., Ex. A.) Subpart (b) of O.C.G.A. § 20-2-989.5 states that it is the duty of local school administrations to "adopt a complaints policy for *certified personnel.*" (emphasis added). Second, "termination, non-renewal, demotion, suspension, or reprimand of an employee" are specifically excluded from Policy GAE. Board policies and procedures relating to termination or suspension of *certified* employees carry the descriptive code "GBN." Thus, Policy GAE does not apply to Plaintiff who is a *classified at-will employee* seeking a review of a *termination decision.*

28

The only policy that is relevant to Plaintiff is Policy GCK, which explicitly references classified at-will employees seeking reviews of termination decisions. Therefore, to the extent that Plaintiff's argument challenges Policy GCK because it restricted Policy GAE in violation of the Settlement Agreement, that argument must fail because Policy GAE and the rights attendant to it are wholly irrelevant to Plaintiff's case.

### b. Policy GCK Expanded the Grievance Procedure As Required by the Settlement Agreement

The Court must next consider whether Policy GCK expanded the grievance procedures available to classified at-will employees in accordance with the Settlement Agreement. Based upon a comparison between the version of Policy GCK in place before the Settlement Agreement and the version revised after the Settlement Agreement, it appears that the Board provided an "expanded grievance policy." Pursuant to the Settlement Agreement, certain classified at-will employees could appeal a termination recommendation before final action was taken. Further, the Columbia County School Administration agreed to implement procedures on due process. The Board complied with both provisions of the Settlement Agreement.

First, under the revised version of Policy GCK, classified at-will employees who maintain continuous employment for a minimum of twenty-four (24) months are afforded the right to

have their termination recommendations reviewed. Unlike the version of Policy GCK in place before the Settlement Agreement, the revised version of Policy GCK provides an employee the opportunity to apply for an appeal hearing. Second, the School District implemented new procedures relating to due process, which is called "Procedure GCK." Procedure GCK describes in detail the process an employee must follow in order to have a termination recommendation reviewed by the Board. Procedure GCK also describes the appeal hearing process should the Board decide to grant a hearing. Therefore, the Board complied with the Settlement Agreement because it expanded the grievance policy for classified at-will employees and implemented Procedure GCK.

### c. **The Board Complied with the Provisions of Policy GCK and Procedure GCK**

Plaintiff next contends that the Board breached the Settlement Agreement by denying her the opportunity to appeal directly to the Board. In order to resolve this issue, the Court must determine whether the Board complied with the provisions of Policy GCK and Procedure GCK. Pursuant to Policy GCK and Procedure GCK, after a review by the Assistant Superintendent and Superintendent Nagle, the employee has the right to have the termination recommendation reviewed by the Board. (Pl.'s Exs. 44, 45.)

Here, Plaintiff sought review of the recommendations to terminate her employment. Indeed, Plaintiff admits that she appealed all the way up to the Board and submitted a written statement of all the information that she believed was necessary for the Board to understand her side of the story. (Jordan Dep. at 60-61.) Her statement was submitted to the Board along with other written materials related to the termination recommendation. (Whitaker Aff. ¶ 6; Bridges Aff. ¶ 6; Blackburn Aff. ¶ 6; Sleeper Aff. ¶ 6; Buccafusco Aff. ¶ 6.) The Board reviewed those materials and decided to uphold the termination recommendation. (Id. ¶ 10.) Therefore, Plaintiff was provided the opportunity to have her case reviewed by the Board.

In regard to the argument that Plaintiff was entitled to a hearing before the Board under the terms of the Settlement Agreement, this claim must also fail. The Board complied with Policy GCK and Procedure GCK when it determined that an appeal hearing was unnecessary. Nothing in Policy GCK or Procedure GCK provides for an unqualified right to a hearing. While Policy GCK and Procedure GCK allow classified at-will employees a right to appeal a termination recommendation, the Board reserves the right to determine whether to conduct hearings on those appeals. (Whitaker Aff. ¶ 16; Bridges Aff. ¶ 16; Blackburn Aff. ¶ 16; Sleeper Aff. ¶ 16; Buccafusco Aff. ¶ 16.) Policy GCK states "*upon good cause*, the Board *may* grant such employees the

opportunity of an appeal hearing." (Doc. no. 64, Ex. 14) (emphasis added).

Moreover, counsel for the School District who negotiated the Settlement Agreement confirmed that, during the negotiations between the parties, the union demanded that certain classified at-will employees be granted the right to a hearing before the Board in connection with all termination recommendations by the School Superintendent. (Fletcher Aff. ¶ 4.) The Board, however, rejected this request. (Id. ¶ 5.)

Therefore, under the terms of the final Settlement Agreement, the Board reserved the right to determine, on a case-by-case basis, whether to conduct evidentiary hearings on termination recommendations for classified at-will employees. (Id. ¶ 6.) Plaintiff applied for a hearing, and the Board considered her request. (Whitaker Aff. ¶ 5; Bridges Aff. ¶ 5; Blackburn Aff. ¶ 5; Sleeper Aff. ¶ 5; Buccafusco Aff. ¶ 5.) The Board, however, voted to deny Plaintiff's request because they determined that the grounds for the termination recommendation were sufficiently presented to them in written materials, and thus there was no need for a hearing. (Id. at ¶ 8.) Because Plaintiff was not entitled to an automatic appeal hearing, the Board did not violate the Settlement Agreement in failing to grant her request. Thus Defendants' motion for summary judgment on Plaintiff's breach of contract claim is **GRANTED**.

## 2. 42 U.S.C. § 1983 Denial of Procedural Due Process

Plaintiff next claims that her termination amounted to a violation of procedural due process, and she seeks relief pursuant to § 1983. In order to establish a procedural due process violation under § 1983, a plaintiff must show: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). Even if Plaintiff alleges and satisfies these elements, she cannot state a federal procedural due process claim if adequate state remedies are available to her. McKinney v. Pate, 20 F.3d 1550, 1562-64 (11th Cir. 1994).

The Fourteenth Amendment protects against the government's deprivation of liberty or property without procedural due process. Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972). State law determines whether a public employee has a property interest in his or her job. Bishop v. Wood, 426 U.S. 341, 344 (1976); Barnett v. Housing Auth. of Atlanta, 707 F.2d 1571, 1576 (11th Cir. 1983) (overruled on other grounds). A constitutionally protected property interest is created if there are "rules of mutually explicit understandings that support [a] claim of entitlement." Perry v. Sindermann, 408 U.S. 593, 601 (1972). "To obtain a protected property interest in employment, a person must have more than a mere unilateral expectation of continued employment; one must have a legitimate

claim of entitlement to continued employment." <u>Warren v. Crawford</u>, 927 F.3d 559, 562 (11th Cir. 1991). Thus, to evaluate the validity of Plaintiff's procedural due process claim, the Court must first determine whether she had a protected property interest in her employment as a bus driver with the School District.

Under Georgia law, in the absence of a controlling contract between the parties, employment for an indefinite period of time is terminable at will by either party. <u>Land v. Delta Air Lines</u>, 130 Ga. App. 231 (1973); <u>see also</u> O.C.G.A. § 34-7-1. Moreover, a public employee generally has no property right in such employment. <u>Ogletree v. Chester</u>, 682 F.2d 1366, 1369 (11th Cir. 1982) (citing <u>Barnes v. Mendonsa</u>, 110 Ga. App. 464 (1964)). However, a public employee has a property interest in his job if his employment allows dismissal only for cause. <u>Warren</u>, 927 F.3d at 562. An explicit contractual provision, rules, or common understanding may determine whether an employee is terminable at will or only for cause. <u>DeClue v. City of Clayton</u>, 246 Ga. App. 487, 489 (2000). The expectations of the parties involved are also relevant to this issue. <u>Maxwell v. Mayor & Aldermen of Savannah</u>, 226 Ga. App. 705, 707 (1997).

Plaintiff contends that Policy GCK provided her with a protected property interest. Policy GCK states that the Superintendent can terminate, pending Board approval, "any auxiliary employee who fails to comply with employment

34

expectations and rules, who fails to perform assigned duties, *or for any other good and sufficient cause.*" (Pl.'s Ex. 44) (emphasis added). Plaintiff asserts that, based on this language, she could only be terminated for cause, and thus she had an expectation of continued employment sufficient to bestow a protectable property interest.

Policy GCK further provides "nothing in this policy shall grant the right to continued employment or change the legal status of at-will employees." (Id.) Procedure GCK contains a similar disclaimer and states that the procedure is merely designed "to give auxiliary employees a fair means to have terminations . . . informally reviewed." (Pl.'s Ex. 45.) Defendants contend that this disclaimer demonstrates that Plaintiff remained an at-will employee and that the School District did not intend to expand the rights of classified at-will employees.

Despite Plaintiff's claim to the contrary, Policy GCK does not grant her a property interest in continued employment because the Superintendent has broad discretion to recommend termination. Although Policy GCK contains "for cause" language, it does not provide that Plaintiff could *only* be terminated for cause. Cf. Glenn v. Newman, 614 F.2d 467, 472 (5th Cir. 1980) (provision that allowed suspension only "for cause" created a

property interest).[12]  Policy GCK states that the Superintendent may terminate, pending Board approval, "any employee who fails to comply with employment expectations and rules, who fails to perform assigned duties, or for any other good and sufficient cause."  (Pl.'s Ex. 44.)  The Columbia County Auxiliary Employment Handbook provides a list of ten (10) specific expectations for School District employees.  (Pl.'s Ex. 43.) However, the Handbook also states that the guidelines are offered to insure that employees understand expectations for job performance and that they are "not intended to be all-inclusive" because "other specific expectations exist for all positions." (Id.)  The fact that the Superintendent could terminate an employee for violating an employment expectation not expressly listed in the Handbook or in Policy GCK demonstrates that he could terminate for reasons other than "good cause."  See Warren, 927 F.2d at 563 (finding no property interest because employees could be dismissed at the discretion of the administrator); Georgia Ports Auth. v. Rogers, 173 Ga. App. 538, 539 (1985) (finding no property interest when policy manual's list of reasons for termination indicated that it was not exclusive of other possible reasons).  Thus, despite the "for cause" language, Policy GCK places no limit on the Superintendent's ability to determine whether an employee

---

[12] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (holding Fifth Circuit decisions made on or before September 30, 1981, are binding precedent in Eleventh Circuit).

complied with employment expectations and recommend termination based on that decision. See Edwards v. Brown, 699 F.2d 1073, 1076-77 (11th Cir. 1983) (finding no property interest because ordinance placed no limit on the commissioner's discretion to determine whether an employee had fulfilled the standards of "good behavior and efficient service").

Moreover, even if the "for cause" language limited the Superintendent's ability to recommend termination, that limitation applies only to the Superintendent and not to the Board. Both Eleventh Circuit and Georgia case law recognize that, under certain circumstances, policies and personnel manuals which include language that an employee may only be terminated "for cause" grant the employee a property interest in continued employment. See Brown v. Ga. Dep't of Revenue, 881 F.2d 1018, 1024-25 (11th Cir. 1989) (finding state granted a property interest by providing that permanent status employees may not be fired except in accordance with the Personnel Board rules); Barnett, 707 F.2d at 1576-77 (noting the personnel policy permitted involuntary discharge only "for cause," which limited the power of the appointing body to dismiss and created a property interest in continued employment); Brownlee v. Williams, 233 Ga. 548, 550-51 (1975)(finding statute that stated that the appointing authority could only dismiss for cause created a property interest in continued employment); DeClue, 246 Ga. App. at 489-90 (holding policy that allowed disciplinary

37

action against employees only for certain specified reasons was evidence that the employee had a property interest in continued employment).

However, Policy GCK is distinguishable from the policies in the above-cited cases. In those cases, the employees had property interests because the "for cause" language curtailed the *employer's* right to terminate in a substantial way. See Brown, 881 F.2d at 1027 (the "for cause" language suggested that there was some substantive limitation on the state's ability to terminate covered employees); Barnett, 707 F.2d 1576-77 ("We conclude that, by limiting the power of the appointing body to dismiss an employee, these regulations confer on [the plaintiff] a valid property interest in continued employment."); see also Dethrow v. Parkland Health Hosp. Sys., No. 3:00-cv-2126, 2002 WL 413905, at *5 (N.D. Tex. March 11, 2002) (finding that in order for an employment policy to alter the at-will nature of employment, "the policy must specifically and expressly limit the *employer's* ability to terminate the employee" (emphasis added)). Under the facts of this case, the Board has the authority to terminate, not the Superintendent. Pursuant to Policy GCK, the Superintendent can *only* recommend termination; the recommendation, however, is subject to Board approval. Moreover, Superintendent Nagle stated that he does not have unilateral authority to terminate any employee, and that this authority rests solely with the Board. (Nagle Dep. at 44.)

Thus, unlike the above-cited cases, nothing in Policy GCK limits the Board's (the employer) right to terminate. Because the "for cause" language does not apply to the Board, it does not create a protectable property interest.

Interpreting the "for cause" language as applying only to the Superintendent's termination authority is consistent with the disclaimer that the policy was not meant to transform the status of at-will employees. The disclaimer affirms the Board's intent that Policy GCK does not alter its legal relationship with classified at-will employees. Therefore, despite the apparent contradiction between the "good cause" language and the disclaimer, the two are reconcilable. The "good cause" language applies only to the Superintendent, while the disclaimer demonstrates that the "good cause" language was not meant to affect the relationship between the Board (the employer) and classified at-will employees. Therefore, Defendants' motion for summary judgment on Plaintiff's procedural due process claim is **GRANTED.**

### 3. 42 U.S.C. § 1983 Denial of Substantive Due Process

Plaintiff also asserts that Defendants terminated her employment in violation of her substantive due process rights. However, the protection of substantive due process does not apply in the employment law context. Instead, the substantive due process protections of the United States Constitution extend only to certain fundamental rights so "implicit in the concept

of ordered liberty" that "no amount of process can justify [their] infringement." <u>Gibson v. City of Gadsden</u>, 377 Fed. Appx. 953, 956 (11th Cir. 2010) (quoting <u>McKinney</u>, 20 F.3d at 1556-57); <u>White v. Hall</u>, 389 Fed. Appx. 956, 959 (11th Cir. 2010). "Because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection." <u>Gibson</u>, 377 Fed. Appx. at 956. Thus, Defendants' motion for summary judgment on Plaintiff's substantive due process claim is **GRANTED**.[13]

## IV. CONCLUSION

Upon the foregoing, Defendants' Motion for Summary Judgment (Doc. no. 32) is **GRANTED**. The Clerk is directed to **ENTER JUDGMENT** in favor of Defendants and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia this 20th day of March, 2012.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[13] It appears from the parties' briefs that Plaintiff also claims that the denial of a hearing amounted to a violation of her Equal Protection rights. Because Plaintiff failed to present any evidence of similarly situated non-union employees who received a hearing, Plaintiff's claim must necessarily fail.